## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Honorable Brian R. Martinotti, U.S.D.J. |
| v. | : | |
| MATTHEW S. ELLIS | : | Crim. No. 19-693 |

---

## MOTIONS IN LIMINE AND FOR RECIPROCAL DISCOVERY
## BY THE UNITED STATES OF AMERICA

---

<u>On the Brief</u>:
GEORGE L. BRANDLEY
BERNARD J. COONEY
Assistant United States Attorneys
United States Attorney's Office
District of New Jersey

The Government respectfully submits this memorandum of law in support of its motions in limine and for reciprocal discovery. Trial in this case is scheduled to begin on February 3, 2025.

## PROCEDURAL & FACTUAL BACKGROUND

### *Procedural Background*

On September 25, 2019, a federal grand jury in New Jersey indicted defendants Matthew S. Ellis, Edward B. Kostishion, Kyle D. McLean, and Kacey C. Plaisance, for conspiracy to commit health care fraud, contrary to 18 U.S.C. § 1347, in violation of 18 U.S.C. § 1349 (Count 1); and defendants Kostishion, Plaisance, Jeremy M. Richey, and Jeffrey Tamulski for conspiracy to violate the Anti-Kickback statute, contrary to 42 U.S.C. § 1320a-7b(b)(1)(A), in violation of 18 U.S.C. § 371 (Count 2). *See* ECF No. 29 (Indictment).

Defendants Plaisance, McLean, Kostishion, Richey, and Tamulski have each pleaded guilty to Superseding Informations.[1]

---

[1] On May 6, 2020, defendant Plaisance pleaded guilty pursuant to a plea agreement with the Government to a Superseding Information charging him with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and conspiracy to violate the Anti-Kickback statute, in violation of 18 U.S.C. § 371. *See* ECF Nos. 82, 86.

On June 5, 2020, defendant McLean pleaded guilty pursuant to a plea agreement with the Government to a Superseding Information charging him with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. *See* ECF Nos. 89, 93.

On November 19, 2020, defendant Kostishion pleaded guilty pursuant to a plea agreement to a Superseding Information charging him with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and conspiracy to violate the Anti-Kickback statute, in violation of 18 U.S.C. § 371. *See* ECF Nos. 110, 114.

On March 29, 2021, defendant Richey pleaded guilty pursuant to a plea agreement

Accordingly, this matter will proceed to trial only on Count 1—conspiracy to commit health care fraud—as to Defendant Matthew Ellis ("defendant Ellis").

**_Factual Background[2]_**

Ark Laboratory Network LLC ("Ark") was a company that purported to operate a network of laboratories that facilitated genetic testing. Ark was owned by defendants Plaisance, Kostishion, and Richey. Ark partnered with Privy Health Inc. ("Privy") and another company (referred to in the Indictment as the "Distribution Company") (together, the "Patient Acquisition Groups") to acquire DNA samples from patients and submit those samples to laboratories for genetic testing in exchange for illicit kickback payments.[3] Defendant McLean owned Privy and defendant Ellis ostensibly served as Privy's Medical Director.

In or around 2018, health insurers, including government payors such as Medicare, would pay laboratories via reimbursements to perform expensive genetic

---

to a Superseding Information charging him with conspiracy to violate the Anti-Kickback statute, in violation of 18 U.S.C. § 371.  _See_ ECF Nos. 123, 127.

On March 26. 2024, defendant Tamulski pleaded guilty pursuant to a plea agreement with the Government to a Superseding Information charging him with conspiracy to violate the Anti-Kickback statute, in violation of 18 U.S.C. § 371.  _See_ ECF Nos. 213, 217.

[2] The facts contained in this section are primarily derived from the Indictment and the above-referenced Superseding Informations.

[3] McLean and others managed the Distribution Company's operations from in and around 2017 until in and around May 2018.  The Distribution Company also served as Ark's sole Patient Acquisition Group during that period.  In May 2018, McLean assumed the direction and control of Privy, at which point Privy became Ark's exclusive Patient Acquisition Group.

tests for their covered patients, referred to as "beneficiaries." Genetic tests are laboratory tests designed to identify specific inherited mutations in a patient's genes. These genetic variations may affect a patient's risk of developing certain diseases—such as cancer—or how the patient responds to certain medications.

Among the most expensive genetic tests that insurance payors agreed to pay for were "CGx" tests—which relate to a patient's hereditary predisposition for cancer—and "PGx" tests—which relate to identifying how a patient's genes affect the patient's response to drugs. To conduct a CGx or PGx test, a laboratory must obtain a DNA sample from the patient. Such samples are typically obtained from the patient's saliva by using a cheek (buccal) swab to collect sufficient cells to provide a genetic profile. The DNA sample is then submitted to the laboratory for analysis along with a laboratory test requisition form which lists, among other things, a brief description of the patient's medical history and/or conditions justifying performing the specific test being requested. The governing regulations require CGx and PGx tests to be ordered by the patient's treating physician for use in the ongoing care of the patient and, thus, the requisition form must be signed by that physician.

Once the sample and requisition form are submitted, the laboratory reviews and approves the requisition form and, if approved, performs the requested test. If the patient has insurance, the laboratory typically submits a claim for reimbursement for the test to the patient's insurance carrier for costs associated with performing the test. As relevant here, reimbursement rates for CGx tests may

3

exceed $10,000 per test, while reimbursement rates for PGx may exceed $6,500 per test.

As part of the conspiracy, Ark instructed the Patient Acquisition Groups to market CGx and PGx tests to patients through various methods, including but not limited to, offering $75 gift cards to patients under the guise of a purported "market research study," and promoting genetic tests to patients attending public and corporate wellness fairs, on social media, and at expositions.

The Patient Acquisition Groups would then collect DNA samples and Medicare information from those patients without the involvement of any treating health care professional—including defendant Ellis—then use information gathered from the patient to create laboratory requisition forms, and provide the samples and forms to Ark.  Ark, in turn, would submit those samples and requisition forms to various laboratories to perform CGx and PGx tests.

For his role in the scheme, the defendant Ellis authorized Ark and Privy to affix his signature to the requisition forms that Ark sent to the laboratories performing the tests even though he never saw, examined, or treated those patients and, in many cases, was not authorized to practice medicine in the state where the patient lived.  Those requisition forms falsely represented that defendant Ellis was ordering the CGX or PGX test as the patients' treating physician as required under governing regulations.  The requisition forms often further represented that defendant Ellis had (i) provided information to the patient regarding genetic testing; (ii) deemed the test medically necessary for the diagnosis or detection of a

disease or illness; (iii) would use the test results in the medical management and treatment decisions for the patient; and (iv) was authorized by law to order the tests requested.

Once the laboratories received the requisition forms listing defendant Ellis as the treating physicians, the laboratories performed the tests and submitted reimbursement claims to the patients' insurance carriers. Those insurance carriers paid the laboratories substantial reimbursement payments and, in turn, the laboratories would pay Ark an agreed-upon percentage of the reimbursement payment in exchange for sending the test to the laboratory.[4] In 2018 alone, Medicare paid the relevant laboratories at least approximately $4.6 million for genetic tests defendant Ellis and his co-conspirators ordered or caused to be ordered as part of the conspiracy.

---

[4] Count Two of Indictment charged Plaisance, Kostishion, Richey and McLean with conspiring to violate the Anti-Kickback Statute through this illicit agreement under which laboratories paid Ark in exchange for Ark steering the genetic tests to the laboratories. Defendant Ellis was not charged in Count Two.

## **LEGAL ARGUMENT**

In advance of the trial, the Government respectfully submits these motions in limine, summarized below:

I.    The Court Should Preclude Evidence or Argument Blaming the Victim for Failing to Discover the Fraudulent Scheme.

II.    Statements of Co-Conspirators Should Be Admitted as Non-Hearsay at Trial.

III.    The Court Should Preclude Evidence and Argument Related to Jury Nullification, Punishment, or Individuals Who Might Have Been, But Were Not, Charged with Crimes.

    1.    The Court Should Bar Defendant Ellis from Introducing Evidence or Argument Regarding Whether or Not the Genetic Tests May Have Been Medically Necessary and/or Beneficial to Those Tested.

    2.    The Court Should Bar Defendant Ellis from Arguing or Suggesting that His Conduct Was Not Criminal Because It Was Routine Conduct in the Health Care Industry.

    3.    The Court Should Bar Defendant Ellis from Introducing Evidence or Argument Regarding the Government's Charging Decisions for Other Parties.

    4.    The Court Should Preclude Any Reference to Possible Punishment or Collateral Consequences of Conviction.

IV.    The Court Should Preclude Defendant Ellis From Impeaching co-Defendant Kyle D. McLean On Details Of His Fraud Conviction.

 V. Defendant Ellis Should Be Precluded From Making an "Ignorance of the Law" Claim.

 VI. The Court Should Preclude Defendant Ellis From Improperly Arguing About the Government's Failure to Call a Particular Witness.

 VII. The Court Should Preclude the Use of Agent Reports or Notes for Impeachment Purposes and Should Require that Defendants Comply with Fed. R. Evid. 613.

VIII. The Court Should Allow the Government to Use Hypothetical Questions Related to Victims' Reliance on Defendant Ellis's Misrepresentations.

 IX. The Court Should Find That Statements Made By Defendant Ellis To Members Of Law Enforcement Are Admissible If Used By The Government As Statements Of A Party Opponent, But Are Not Admissible If Offered As Self-Serving Hearsay.

 X. Defendant Ellis Should Be Ordered to Provide Reciprocal Discovery to the Government As Soon As Possible.

 XI. The Court Should Permit the Government to File Additional Motions in Limine as May Be Necessary.

**I. The Court Should Preclude Evidence or Argument Blaming the Victim for Failing to Discover the Fraudulent Scheme.**

 At trial, defendant Ellis may argue or suggest that his conduct was lawful because the victim insurance plans—namely Medicare—covered and paid for the fraudulent genetic tests generated as part of the conspiracy.  However, such

7

arguments that "blame the victim" are irrelevant to the issues at trial and would mislead the jury.

It is well-established that "[t]he negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct." *United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995); *United States v. Salzano*, Crim. No. 22-690, 2024 Wl866885, *16 (D.N.J. Feb. 26, 2024) (granting government's motion in limine to preclude a "blame the victim" defense); *United States v. Dubose*, 639 F. Supp. 3d 503, 508-09 (E.D. Pa. 2022) (same, referring to the theory as "legally unsustainable").

For example, *United States v. Leadbeater*, 2015 WL 567025, at *8-9 (D.N.J. Feb. 10, 2015), a mortgage fraud case, the defendants sought to argue at trial that their conduct was lawful because the victim lenders failed to scrutinize the loan applications at issue and did not stop the conduct. *Id.* at *8. The court rejected the defendants' argument and precluded them from suggesting at trial that the lenders "were not sufficiently careful or prudent in protecting themselves from fraud." *Id.* at *9. In so doing, the court recognized that "how closely the victim lenders scrutinized the loan applications" was irrelevant at trial and that the relevant inquiry instead was whether "the defendants had an agreement to defraud." *Id.* (citing *Neder v. United States*, 527 U.S. 1, 24-25 (1999)). Thus, the court barred this irrelevant and misleading "blame the victim" argument. *Leadbeater*, 2015 WL 567025, at *9; *see also United States v. Rivera-Ortiz,* 14 F.4th 91, 101-02 (1st Cir. 2021) ("the district court repeatedly justified its exclusionary ruling based on a

concern that Rivera, in drawing attention to the lack of action by the relevant agencies, might be suggesting a kind of 'blame-shifting' defense that would confuse jurors"); *Salzano*, 2024 WL 866885, *16 (observing that "[t]he susceptibility of the victim of the fraud … is irrelevant to the analysis"(quoting *United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000))

Here, just as in *Leadbeater* and *Rivera-Ortiz*, the appropriate issue for the jury to consider at trial is not whether Medicare or other victim insurance payors should have unveiled the fraud or ceased payment on the insurance claims sooner than they did.  Rather, what the jury must and solely should consider is evidence relevant to, among other things, whether: (1) two or more persons agreed to commit health care fraud; (2) defendant Ellis was a party to or member of that agreement; and (3) he joined the agreement knowing of its objective to commit health care fraud and intended to join together with at least one co-conspirator to achieve that objective.  *See, e.g.*, *Third Circuit Model Jury Instructions* § 6.18.371A.

Thus, blaming the victim or suggesting that defendant Ellis's conduct was lawful because the victim insurance plans covered the genetic tests at issue or failed to discover that he was not seeing the patients for whom he was ordering tests would significantly confuse the issues at trial and mislead the jury.  *See, e.g., Dubose*, 639 F. Supp. 3d at 508 (granting government's motion in limine and precluding defense argument that no fraud occurred because the victim failed to identify claims submitted by defendants as fraudulent, because "to allow Defendants to refer to [the argument] during the trial risks confusing the jury").

Accordingly, the Court should preclude defendant Ellis from arguing or suggesting at trial that the victim insurance plans continued payment of claims or failure to timely identify the fraud are a defense to his conduct.

## II.    Statements of Co-Conspirators Should Be Admitted as Non-Hearsay at Trial.

Pursuant to Federal Rule of Evidence 801(d)(2)(E), an out-of-court statement is admissible as non-hearsay when the Government demonstrates by a preponderance of the evidence that: (1) a conspiracy existed when the statement was made; (2) both the declarant and the defendant against whom the statement is offered were members of that conspiracy; and (3) the statement was made during the course of, and in furtherance of, the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *United States v. Turner*, 718 F.3d 226, 231 (3d Cir. 2013); *United States v. Bobb*, 471 F.3d 491, 498–99 (3d Cir. 2006). In making a factual determination of the admissibility of co-conspirator statements under this rule, the Court may consider the statements themselves, if they are corroborated by independent evidence. *Bourjaily*, 483 U.S. at 180–81; *Turner*, 718 F.3d at 231; *United States v. McGlory*, 968 F.2d 309, 333–34 (3d Cir. 1992). Even a statement by an anonymous declarant may be admissible if "the [G]overnment [can] show that the unknown declarant was more likely than not a coconspirator." *Id.* at 335 (quoting *United States v. Helmel*, 769 F.2d 1306, 1313 (8th Cir. 1985)). "Statements are admissible under this Rule even if the basis for admission is a conspiracy different from the one charged." *Turner*, 718 F.3d at 231 (internal quotation marks

omitted).

As described in detail above, defendant Ellis participated in a sophisticated scheme involving several co-conspirators acting in furtherance of the conspiracy to defraud health insurers.  At trial, the Government will make the requisite showing, by a preponderance of the evidence, that the statements of defendant Ellis's co-conspirators fall under Rule 801(d)(2)(E): they were made during a conspiracy by declarants who were members of the same conspiracy as defendant Ellis and were made during the course, and in furtherance, of that conspiracy.  *See Bobb*, 471 F.3d at 498–99.

As to the first two elements, the Court need only find, by a preponderance of the evidence after considering the statement itself and other evidence at trial, that the conspiracy existed and that the declarant was more likely than not a co-conspirator.  *See McGlory*, 968 F.2d at 333-36; *United States v. Cruz*, 910 F.2d 1072, 1080-83 (3d Cir. 1990). "[O]nce the Government establishes a defendant's involvement in an ongoing conspiracy, the burden shifts to the defendant to prove by affirmative acts inconsistent with the object of the conspiracy that he withdrew." *United States v. Gibbs,* 739 F.2d 838, 845 (3d Cir. 1984).  "The law is well settled that out-of-court statements may be admissible under Rule 801(d)(2)(E) even if the defendant is not formally charged with any conspiracy in the indictment." *United States v. Ellis*, 156 F.3d 493, 497 (3d Cir. 1998).

As to the third and final element, the Third Circuit has explained that "[t]he threshold for establishing that a statement was made in furtherance of a conspiracy

is not high." *United States v. Duka*, 671 F.3d 329, 348 (3d Cir. 2011). Additionally, the "in furtherance of" requirement has been given "a broad interpretation." *United States v. Weaver*, 507 F.3d 178, 183 (3d Cir. 2007) (quoting *Gibbs*, 739 F.2d at 845). For example, statements are made in furtherance of the conspiracy where they are directed to the purpose of the conspiracy, "intended to promote the conspiratorial objectives of the conspiracy," *Weaver*, 507 F.3d at 184 (quoting *United States v. Reyes*, 798 F.2d 380, 384 (10th Cir. 1986), or intended to conceal the conspiracy so that the conspiracy can continue, in which case the hearer need not be a co-conspirator, *Weaver*, 507 F.3d at 181–87; *United States v. Ammar*, 714 F.2d 238, 253 (3d Cir. 1983).

Moreover, discussions among co-conspirators about prior events still meet the "in furtherance of" requirement when the statements form the basis for informing co-conspirators about the overall status of the conspiracy. *Weaver*, 507 F.3d at 184. Similarly, statements are admissible when a co-conspirator keeps other co-conspirators "abreast of developments to induce their continued participation" in the conspiracy. *Gibbs*, 739 F.2d at 846.

Here, the statements *from* defendant Ellis's co-conspirators which the Government intends to introduce at trial and on which the Government seeks a pretrial ruling include statements, emails, and text messages between and among defendant Ellis's co-conspirators, including co-defendants Plaisance and McLean, among others.

Emails and text messages that defendant Ellis himself sent to others are

excluded from the hearsay definition because they are out-of-court statements made by a party opponent (*i.e.*, defendant Ellis).  *See* Fed. R. Evid. 801(d)(2); *United States v. Browne*, 843 F.3d 403, 416 (3d Cir. 2016) (affirming finding that authenticated Facebook chats constituted admissions by a party opponent under Rule 801(d)(2)(A)); *United States v. Siddiqui*, 235 F.3d 1318, 1323 (11th Cir. 2000) (emails sent by a criminal defendant "constitute admissions of a party pursuant to Fed. R. Evid. 801(d)(2)(A)"); *United States v. Gasperini*, Crim. No. 16-441, 2017 WL 4140366, *5 (E.D.N.Y. July 21, 2017) ("[E]mails sent by Defendant are admissible for their truth as statements of a party-opponent" under Rule 801(d)(2)(A)); *United States v. Tann*, 425 F. Supp. 2d 26, 37-38 (D.D.C. 2006) (finding email chain including statements of defendant admissible under Rule 801(d)(2)); *Klein v. Frenkel*, 2015 WL 13721693, at *7 (E.D.N.Y. Feb. 19, 2015) (emails sent by civil defendant admissible as non-hearsay admissions of a party opponent).

Emails and text messages sent from others *to* defendant Ellis are also not hearsay because they are being offered for the non-hearsay purposes of providing context for defendant Ellis's emails and text messages; showing the relationship between and among defendant Ellis and his co-conspirators; showing the effect of the e-mails and text messages on defendant Ellis; and showing his intent and lack of mistake. *See, e.g.*, *Gasperini*, 2017 WL 3140366, *5 (denying defendant's motion in limine seeking to exclude as hearsay emails that defendant received).

Emails and text messages sent to a defendant or other party opponent are admissible for non-hearsay purposes. For example, in *United States v. Dupree*, the

Second Circuit upheld the admission of emails sent by a fraud victim to a defendant, in which the victim complained it was being defrauded, because those messages "provide context for defendants' messages sent in response to them." 462 F.3d 131, 136–37 (2d Cir. 2006); *see also Klein*, 2015 WL 13721693, at *7 (emails sent in response to a defendant's statements "are also admissible for the non-hearsay purpose of providing context to [the defendant's] statements"); *United States v. Jin*, 833 F. Supp. 2d 957, 969 (N.D. Ill. 2011) (admitting emails from a non-party to a defendant "for the non-hearsay purpose of providing context to [the defendant's] response emails"); *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 420 (S.D.N.Y. 2011) ("Where a statement is deemed admissible as an admission by a party opponent under Rule 801(d)(2), the surrounding statements providing essential context may also be considered.").[5]

Given the scope of the conspiracy in this case, the Government anticipates evidence of several co-conspirator statements exchanged with defendant Ellis. The Court should find that the statements of defendant Ellis's co-conspirators are admissible at trial as non-hearsay under Rule 801(d)(2)(E).

### III.    The Court Should Preclude Evidence and Argument Related to Jury Nullification, Punishment, or Individuals Who Might Have Been, But Were Not, Charged with Crimes.

The Court should preclude defendant Ellis from arguing for or otherwise

---

[5] Of course, certain e-mails and attachments and text messages may also be offered for the truth of the matter asserted therein because they are not hearsay or subject to a hearsay exception.

presenting evidence or pursuing lines of inquiry designed to elicit jury nullification. It is well established that jury nullification—asking the jury to decide a case on extraneous matters—is "an aberration under our system." *United States v. Bruce*, 109 F.3d 323, 327 (7th Cir. 1997) (cleaned up); *see also United States v. DeMuro*, 677 F.3d 550, 565 (3d Cir. 2012) (holding that district court properly excluded evidence that would have invited jury nullification). Because "jury nullification violates the sworn jury oath and prevents the jury from fulfilling its constitutional role," *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006), any appeal to jury nullification is effectively "invit[ing] the jury to act lawlessly," *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996).

Moreover, evidence and argument directed toward jury nullification has no tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence, and is therefore irrelevant under Federal Rule of Evidence 401. Thus, when the only purpose of evidence or argument is to encourage jury nullification, it should be excluded. *See Scarpa v. Dubois*, 38 F.3d 1, 11 (1st Cir. 1994) (noting that "defense counsel may not press arguments for jury nullification in criminal cases"); *see also United States v. Epstein*, 91 F. Supp. 3d 573, 597 (D.N.J. 2015) (excluding evidence of religious consent because its introduction "would open the door to jury nullification"). The Government seeks to exclude jury nullification in all its forms, including (1) argument related to whether or not the genetic tests may have been medically necessary and/or beneficial, (2) argument related to whether the conduct

15

charged was "routine" in the health care industry at the time, (3) argument related to other individuals in this case that have not been prosecuted and, and (4) argument relating to punishment.

     **1.**    **The Court Should Bar Defendant Ellis from Introducing Evidence or Argument Regarding Whether or Not the Genetic Tests May Have Been Medically Necessary and/or Beneficial to Those Tested.**

Defendant Ellis is charged with conspiring to commit health care fraud. Specifically, the scheme to defraud, which resulted in millions of dollars of losses to Medicare, was achieved through obtaining DNA samples so that fraudulent orders for genetic tests could be submitted to laboratories even though the tests were not ordered by a health care provider who was treating the patient for whom the test was ordered. Defendant Ellis's role was to provide his signature on requisition forms falsely certifying that he was the treating physician who was ordering the test to assist in the patient's treatment.

Defendant Ellis should not be permitted to argue to the jury that, even though no medical professional was involved with the examination or ordering of the genetic testing for the patients, the genetic tests were nevertheless medically necessary or beneficial to the patients. Defendant Ellis is alleged to have caused claims to be submitted to Medicare that falsely represented that he was the beneficiary's treating health care provider who had seen the patient and ordered the test because he had determined that it was medically necessary: "[The Defendant] . . . and others, submitted or caused to be submitted requisitions and other patient-

specific documents to the DNA Labs, which falsely stated that [defendant Ellis] was the treating provider for the patient, when, in fact, no interaction between [defendant Ellis] and the patient had ever occurred."  Indictment at ¶ 45.

The Government need not prove that the underlying tests were medically unnecessary for a given patient based on that patient's particular medical condition or eligibility for the tests.  Instead, the orders were rendered fraudulent because there was no *bona fide* doctor-patient relationship from which defendant Ellis could have legitimately ordered the tests: he did not have any contact with the patients, nor did he evaluate whether the test was medically necessary based on a patient's clinical needs, nor did he receive or review the results of the test with the patients.

Moreover, the effectiveness or potential benefits to the beneficiaries of the genetic testing is irrelevant.  As the Third Circuit has explained, in fraud cases there is no requirement that the patient "actually be harmed."  *United States v. Poet*, 315 Fed. Appx. 389, 392 (3d Cir. 2009) (Whether drug substitute used by doctor was effective was irrelevant).  Thus, any argument by defendant Ellis that the genetic tests were medically necessary or beneficial to the victims is irrelevant and would be seeking jury nullification.

**2.    The Court Should Bar Defendant Ellis from Arguing or Suggesting that His Conduct Was Not Criminal Because It Was Routine Conduct in the Health Care Industry.**

Defendant Ellis may seek to introduce evidence regarding the acts or conduct of others in the health care industry, in New Jersey and elsewhere, to argue that he was engaged in routine conduct in the health care industry.  Such evidence is irrelevant to the issues in this case and, if allowed, would distract and confuse the jury.  Defendant Ellis alone is on trial in this case, and the jury should not be presented with evidence about whether others in the health care industry committed similarly improper acts.  Nor should the Court permit argument about whether the conduct of others somehow excuses defendant Ellis's alleged misconduct.

If defendant Ellis concedes that he engaged in the conduct charged in the Indictment, but argues that, even if his conduct was illegal, it amounted to "standard operating procedure" in the health care industry, he would be seeking jury nullification.  Thus, any such arguments should be barred.  *See, e.g., United States v. Paradies*, 98 F.3d 1266, 1285-86 (11th Cir. 1996) (defendant may act with requisite knowledge, willfulness, or specific intent even if he believed his "conduct was either religiously, politically, morally or otherwise required, or that ultimate good would result from [his] conduct").

In an analogous situation, the Second Circuit in *United States v. Stirling*, strongly denounced efforts to defend a securities fraud case on the basis of defense questioning which implied that the charged activities amounted to proper and

routine business practice:

> [The defendants] argue that they were prejudiced by the district court's decision to bar questions put by them to their witnesses regarding the "normalcy" or "usualness" of certain [fraudulent] Greater Gulf practices. The district court instructed counsel not to ask witnesses about "the legal consequences of things," such as whether activities were "wrong," "misleading," "proper," or "ethical." For example, in response to a question from counsel for the appellants, a state court judge from Mississippi testified that because prominent people with good reputations were involved in Greater Gulf, he assumed that it was "normal" for a non-profit corporation to be used to implement the project. Such testimony is not even arguably admissible. It would have been an abdication of responsibility if the trial judge had not interrupted, as he did, to instruct counsel not to ask such questions.

571 F.2d 708, 735-36 (2d Cir. 1978).

Accordingly, defendant Ellis should be precluded from making arguments or presenting evidence regarding acts engaged in by past or present members of the health care industry or suggesting that defendant Ellis's conduct was simply part of routine conduct in the health care industry.

### 3. The Court Should Bar Defendant Ellis from Introducing Evidence or Argument Regarding the Government's Charging Decisions for Other Parties.

Defendant Ellis should be prevented from suggesting that other individuals in this case have not been prosecuted, or arguing that it was unfair to charge defendant Ellis or find him guilty because those other individuals were not charged when they were equally or more culpable. Such arguments are inappropriate for several reasons and the Court should bar him from making this type of argument to the jury.

First, the Government's charging determinations are unsuitable for review by

a jury.  The Supreme Court has held that "the Government retains broad discretion as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985). Although defendant Ellis may speculate about how charging decisions in this matter were made, "the motivations behind the [Government's] charging decisions are unknown [and] undiscoverable" to defendant Ellis.  *United States v. Scott*, 631 F.3d 401, 406 (7th Cir. 2011) (decision to not prosecute defendant's co-conspirator was irrelevant at sentencing).  Thus, defendant Ellis "cannot attribute the government's decision not to prosecute [others] to an independent determination that" any of those individuals, and, in turn, defendant Ellis, is not guilty.  *See United States v. Delgado*, 903 F.3d 1495, 1499 (11th Cir. 1990).  Because the Government's charging decisions with respect to third parties are irrelevant to the issues at trial, evidence regarding those decisions is inadmissible.

Second, apart from being irrelevant, evidence of the Government's charging decisions with respect to third parties is inadmissible under Rule 403.  The question at trial is whether defendant Ellis is guilty of the charged offense, not whether others may also be guilty of that offense.  Thus, allowing defendant Ellis to elicit testimony or make arguments about charging decisions regarding other individuals would do nothing more than "open the door to evidence on collateral issues that would likely confuse the jury." *Id*. at 1499.  The Court should therefore exclude any such evidence to prevent the trial from devolving into a sideshow on matters not germane to the central issues in the case.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("[T]rial judges retain wide latitude . . . to impose reasonable limits

on . . . interrogation that is repetitive or only marginally relevant.").

Third, evidence or argument by defendant Ellis that the Government's charging decisions with respect to third parties demonstrate that defendant Ellis was singled out for prosecution is a way of arguing selective prosecution. Any statements or arguments from the defense regarding selective prosecution are not relevant to defendant Ellis's guilt, have no probative value, and should be precluded. *See United States v. Armstrong*, 517 U.S. 456, 463 (1996) ("A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution"); *see also In re U.S.*, 397 F.3d 274, 286 (5th Cir. 2005) ("[S]elective prosecution is a challenge to the prosecution, not a defense to the crime charged"). At trial, "[t]he issue to be determined is whether [defendant Ellis] committed the crime[] charged; not whether others may have committed uncharged crimes." *United States v. White*, Crim. No. 02-1111, 2003 WL 721567, at *7 (S.D.N.Y. Feb. 28, 2003).

Accordingly, evidence or argument concerning what other people have or have not been charged with is a "waste of time and thus is totally irrelevant." *See id*. In any event, as explained above, claims of selective prosecution are never properly before a jury; any statements by defense counsel regarding the exercise of prosecutorial discretion in this case have no probative value and are only meant to prejudice the jury.

21

### 4.    The Court Should Preclude Any Reference to Possible Punishment or Collateral Consequences of Conviction.

The Court should preclude defendant Ellis from referring—directly or indirectly—to issues concerning possible punishment should defendant Ellis be convicted. This preclusion should extend to discussion or mention of possible collateral consequences, such as potential impact on defendant Ellis's livelihood, including his medical license and ability to practice medicine. This preclusion should apply to opening and closing statements, cross-examination of Government witnesses, direct examination of defense witnesses, documentary exhibits, and any statements made in open court before the jury.

The jury's sole function is to determine guilt or innocence. "[A] non-sentencing jury should not hear evidence about 'what the consequences of its verdict might be.'" *United States v. Santos*, 2022 WL 1698171, *5 (D.N.J. March 22, 2022) (quoting *United States v. Fisher*, 10 F.3d 115, 121 (3d Cir. 1993), and granting government's motion in limine precluding defendants from introducing "evidence or argument pertaining to their potential punishments"). Evidence regarding punishment or the effects of conviction is irrelevant and inadmissible before the jury. The punishment provided by law upon conviction is a matter exclusively within the province of the Court and should never be considered by the jury in any manner in arriving at their verdict as to guilt or innocence. *See Beavers v. Lockhart*, 755 F.2d 657, 662 (8th Cir. 1985) ("Historically, the duty of imposing

22

sentence has been vested in trial judges."); *United States v. Brown*, 744 F.2d 905, 909 (2d Cir. 1984).[6]

The presentation or insinuation of such information to the jury creates a substantial danger that the jury will consciously or subconsciously allow knowledge of such punishment to impact their deliberations.  "The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged." *Shannon v. United States*, 512 U.S. 573, 579 (1994).  Providing jurors with information regarding sentencing or collateral consequences of conviction "invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.*; *see also Pope v. United States*, 298 F.2d 507, 508 (5th Cir. 1962); *Rogers v. United States*, 422 U.S. 35, 40 (1975); *United States v. Greer*, 620 F.2d 1383, 1385 (10th Cir. 1980) (noting that, "[a]bsent a statutory requirement that the jury participate in the sentencing decision, nothing is left for jury determination beyond the guilt or innocence of the accused" (internal quotation marks omitted)).

Evidence which relates to the issue of punishment upon conviction of a criminal offense has no bearing on the only question that the jury will be called

---

[6]  Indeed, Third Circuit Model Criminal Jury Instruction § 3.16—which this Court routinely provides to the jury in its instructions—states that: "If you decide that the Government has proved (name) guilty of a crime, then it will be my responsibility to decide what the appropriate punishment should be.  You should never consider the possible punishment in reaching your verdict."  The Government will include this jury instruction in its proposed jury instructions.

upon to decide at trial: defendant Ellis's guilt or innocence.  Thus, any evidence or insinuation as to punishment or collateral consequences should be barred at trial.

## IV.    The Court Should Preclude Defendant Ellis From Impeaching co-Defendant Kyle D. McLean On Details Of His Fraud Conviction.

If his co-defendant McLean testifies at trial, the Government does not intend to object to defendant Ellis introducing evidence—for impeachment purposes only—that McLean has a prior state court conviction for forgery described further below (the "Prior Conviction").  The Court, however, should still limit any questions regarding the Prior Conviction on cross-examination to: (i) the existence of the Prior Conviction; and (ii) the resulting sentence imposed on McLean.  The Court should not permit defendant Ellis to introduce evidence or question McLean on cross-examination regarding the underlying facts surrounding the Prior Conviction.

By way of background, in or around August 2012, McLean was charged with identity theft and forgery related to his prior real estate appraisal business.  The Government understands that McLean was charged affixing signatures on real estate appraisal reports in connection with mortgage loan applications without the appraisers' authorization.  The Government further understands that those mortgage loans were used in connection with a mortgage fraud scheme where certain other individuals purchased the same set of properties multiple times to artificially inflate the value of the surrounding properties.  In or around December 2014, McLean pleaded guilty to one count of forgery in violation of Illinois Compiled Statutes Chapter 720 Section 17-3.  The remaining charges were dismissed.

24

Federal Rule of Evidence 609 governs the admission of a witness's prior criminal convictions to attack a witness's character for truthfulness. Rule 609(a) provides, in relevant part:

> (1) for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:
>
> > (A) must be admitted, subject to Rule 403, . . . in a criminal case in which the witness is not a defendant; and
> >
> > . . .
>
> (2) for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement.

Fed. R. Evid. 609. Because Rule 609(a)(1)(A) is subject to Rule 403, "courts must consider whether the probative value of a prior conviction is substantially outweighed by the prejudicial effect of admitting the conviction." *Sharif v. Picone*, 740 F.3d 263, 272 (3d Cir. 2014). "[F]our factors should be weighed against the potential for prejudice in admitting a conviction: (1) the nature of the conviction; (2) the time elapsed since the conviction; (3) the importance of the witness's testimony to the case; and (4) the importance of credibility to the claim at hand." *Id.*

Here, McLean's Prior Conviction meets the requirements of Rule 609(a)(2) and is thus admissible for purposes of impeachment. The fact that McLean was convicted for forgery is admissible impeachment evidence in a case where defendant Ellis is charged with authorizing his signature on fraudulent laboratory requisition forms.

The Court, however, should limit cross-examination of McLean to the existence of the forgery conviction and resulting sentence but not the surrounding details. That is because admitting facts underlying of McLean's conviction fails a Rule 403 balancing test. The Prior Conviction has some limited probative value because the jury can evaluate whether McLean's decision to commit forgery in the past undermines his character for truthfulness in this case. However, the probative value of any additional facts surrounding the Prior Conviction is outweighed by the risk of jury confusion and unfair prejudice: the conduct which led to the Prior Conviction arose six years before the relevant period in this case; involved an entirely different set of facts involving mortgage loan applications and not laboratory testing; conducted by an entirely separate set of individuals with no connection to defendant Ellis, Privy, or Ark.

Moreover, the prejudicial effect of introducing the underlying facts is quite high. The facts and details underlying McLean's Prior Conviction risks confusing the jury with evidence of unrelated, prejudicial conduct. Introducing that evidence risks confusing the jury because it relates to another scheme with involves different coconspirators, products, and motives than the those that the jury will consider in this case. Moreover, there is a risk that introducing the underlying facts will have an undue prejudicial effect given that they relate to mortgage applications surrounding the 2007-2008 financial crisis. That financial crisis had profound and far-reaching negative consequences, and so there is profound risk that the evidence may improperly influence jurors by appealing to their emotions or bias based on, for

instance, a personal experience associated with the financial crisis.  Such a juror might unfairly hold McLean unduly accountable for those unrelated circumstances when evaluating his credibility in a completely unrelated health care fraud case.

When faced with Rule 403 balancing issues under similar circumstances, courts often either entirely prohibit the introduction of the prejudicial conviction or sanitize it.  For example, in *United States v. Jose Soto*, this Court held that the defense could elicit only the fact of a conviction and the resulting sentence but not the name of the offense or surrounding details, where the government's sole cooperating witness had been previously convicted of felony cruelty and neglect of children, because under the Rule 403 balancing test, introducing additional details would have been highly prejudicial.  *See* Attachment A, 20-CR-903, Oct. 11, 2022 Trial Transcript at 237-240 (D.N.J.) (Martini, J.).

Consistent with this authority, the Court in this case should permit defendant Ellis to introduce the fact of McLean's Prior Conviction and that he received a prison sentence as a result.  But he should not be permitted to introduce any additional details of the Prior Conviction or questioned McLean on cross-examination in a manner that may elicit such details.

## V.    Defendant Ellis Should Be Precluded From Making an "Ignorance of the Law" Claim.

The statute charged in the Indictment constitutes the relevant law, and the responsibility for instructing the jury as to that law is left to the Court.  Defendant Ellis should be precluded from making an "ignorance of the law" claim, which is not

a valid defense to any of the charged offenses. "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *Cheek v. United States*, 498 U.S. 192, 199 (1991). The statute charged in the Indictment does not qualify as one of the "highly technical statutes," like "the federal criminal tax and antistructuring provisions," that require "proof that the defendant actually knew of the specific law prohibiting the conduct." *United States v. Starnes*, 583 F.3d 196, 211 (3d Cir. 2009). In fraud cases, "the government need only prove that the defendant had the intent to deceive, and ignorance of the law is no defense." *Paradies*, 98 F.3d at 1285; *see also United States v. Porcelli*, 865 F.2d 1352, 1358 (2d Cir. 1989) ("The specific intent required under the mail fraud statute is the intent to defraud, and not the intent to violate a statute.") (citation omitted).

Thus, the Government need not prove that defendant Ellis set out to consciously "break" a particular law, and defendant Ellis should be precluded from making any such arguments to the jury.

## VI.    The Court Should Preclude Defendant Ellis From Improperly Arguing About the Government's Failure to Call a Particular Witness.

The Government requests that defendant Ellis be precluded from commenting on or asking the jury to draw any negative inference from the Government's decision not to call a particular witness. The Government's investigation of this matter included interviewing numerous witnesses, not all of whom will necessarily be called by the Government to testify at trial.

28

"An inference from a party's failure to call a witness equally available to both parties is impermissible." *United States v. Bos.*, 194 F. App'x 890, 892 (11th Cir. 2006) (citing *United States v. Chapman*, 435 F.2d 1245, 1247 (5th Cir. 1971). Should defendant Ellis believe that the testimony of any particular witness not called by the Government should be presented to the jury, defendant Ellis can subpoena that witness, and should not be permitted to raise the Government's decision not to call the witness.

## VII. The Court Should Preclude the Use of Agent Reports or Notes for Impeachment Purposes and Should Require that Defendant Ellis Comply with Fed. R. Evid. 613

The Government has provided broad discovery in this case, including law enforcement reports of interviews with witnesses the Government anticipates calling at trial. Those reports or memoranda of interviews are not verbatim statements of the person interviewed; rather, they are summaries prepared by law enforcement agents. These reports and memoranda, therefore, do not constitute statements under the Jencks Act. *See* 18 U.S.C. § 3500. Accordingly, the Court should preclude the defense from (i) introducing the contents of the report to improperly impeach witnesses during cross-examination; (ii) publishing the contents of the report to the jury; or (iii) otherwise suggesting to the jury that the reports are statements of the witnesses who did not write or adopt them.

In this respect, Federal Rule of Evidence 613 governs the examination of witnesses with respect to prior statements. Rule 613(a) permits a party to examine "a witness about the witness's prior statement." Rule 613(b) permits a party to

introduce "[e]xtrinsic evidence of" such a statement but "only if the witness is given an opportunity to explain or deny the statement." A memorandum summarizing an interview does not qualify as the witness's statement; similarly, an attorney's out-loud quotation of the contents of an interview memorandum is not the "extrinsic evidence" to which Rule 613(b) refers.

Moreover, the language of Rule 613(a) confirms that the statement must, in fact, be a prior statement of the witness before it may be used for impeachment purposes. In this case, however, the written interview reports were not signed or otherwise adopted by the witnesses being interviewed. "[A] witness may not be impeached with a third party's characterization or interpretation of a prior oral statement unless the witness has subscribed to or otherwise adopted the statement as his own." *United States v. Saget*, 991 F.2d 702, 710 (11th Cir. 1993); *see also United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]" it was "properly rejected as a prior inconsistent statement"); *United States v. Chavez*, 979 F.2d 1350, 1355 (9th Cir. 1992); *United States v. Barile*, 286 F.3d 749, 757-58 (4th Cir. 2002); *United States v. Booker*, 375 F. App'x 225, 232 (3d Cir. 2010) (citing *Barile*, and other authorities, in holding that District Court did not err in excluding certain testimony where the defense could not show that the witness made the statement or adopted it).

The construction of Rule 613 adopted by the Fourth, Seventh, Ninth and Eleventh Circuits precludes parties from confusing witnesses and misleading juries:

> [T]he prosecution was concerned that the jury, seeing [defendant's] lawyer reading from [an FBI agent's report of interview], would infer that if the witness denied having made the statement read by the lawyer, the witness must be lying, though in fact the FBI agent who had made the report might have gotten the witness's story down wrong and might have failed to ask the witness to read and sign the statement. . . . [S]ince a statement appearing in an interview report could easily be garbled, yet seem authoritative when read from a paper that the jury would infer was an official FBI document, the judge was reasonable in insisting that the witness be allowed to examine his purported statement before being impeached by it.

*United States v. Marks*, 816 F.2d 1207, 1211 (7th Cir. 1987).

This Court should preclude defense counsel from suggesting to the jury that a witness made statements attributed to him or her in a report of the witness's earlier interview when questioning the witness about potentially contradictory statements in the report. Counsel can ask the witness whether he or she was interviewed on a particular day, and, assuming an affirmative response, whether the witness told the interviewer "X." In so doing, counsel can frame the question using the exact wording of the report without saying that he or she is reading from a particular report. If the witness denies making the statement or fails to recall making it, defense counsel may show the witness the report without indicating to the jury that he is showing the witness a report that purports to summarize the interview. If the witness ultimately answers "no" or fails to recall, defense counsel should be precluded from asking, "then why does it say X [or why isn't X contained] in this report." Counsel similarly should be precluded from suggesting in any way that the statement is contained in the memorandum. Instead, subject to relevance and Rule 403 considerations, defense counsel can call the author of the memorandum to

complete the impeachment.  Requiring compliance with Rule 613 will prevent

defense counsel from reading the contents of reports into the record through the

examination of witnesses.

In addition, an interview report is hearsay under Federal Rule of Evidence

801(c) because it is an out-of-court assertion by the author of the report to the effect

that "this is what the witness told me."  *See In re High Fructose Corn Syrup*

*Antitrust Litig.*, 156 F. Supp. 2d 1017, 1027 (C.D. Ill. 2001) ("The FBI 302 reports

are clearly hearsay under Rule 801 of the Federal Rules of Evidence since they are

out-of-court assertions."), *rev'd on other grounds*, 295 F.3d 651 (7th Cir. 2002).  In

*United States v. Moreno*, 809 F.3d 766 (3d Cir. 2016), the Third Circuit held that it

violated the Confrontation Clause to allow a cooperating witness to read to the jury

excerpts from memoranda written by a law enforcement agent memorializing that

agent's interviews of the witness. *Id.* at 774.  The witness was recounting what an

out-of-court declarant—the agent—was saying the witness had said.  *Id.*  Thus, the

declarant's statement—his report—was being offered for the truth of the matter

asserted—that the witness had actually said those things when interviewed.

Accordingly, in addition to violating Rule 613, reading aloud the contents of an

interview report violates the hearsay prohibition.

Requiring compliance with Rule 613 in no way deprives a defendant of a

meaningful opportunity to confront and cross-examine witnesses.  Where a witness

has not adopted as his or her own statements contained in a law enforcement report

and refuses to do so when confronted with them at trial, "the matter could then be

resolved," not by reading the report aloud, but "by calling the FBI agent who had compiled the report." *Marks*, 816 F.2d at 1211; *accord United States v. Adames*, 56 F.3d 737, 744-45 (7th Cir. 1995); *United States v. Saget*, 991 F.2d 702, 710-11 (11th Cir. 1993). And even if complying with Rule 613 would make it more difficult for defense counsel to impeach witnesses, "cross-examination is not a freestyle exercise, but, rather, must be conducted within reasonable limits." *United States v. Zaccaria*, 240 F.3d 75, 80 (1st Cir. 2001). In short, "the Confrontation Clause guarantees an opportunity for effective examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (*per curiam*).

For these reasons, defense counsel should be precluded from suggesting to the jury that a witness made statements attributed to him or her in a report of the witness's earlier interview. *See Palermo v. United States*, 360 U.S. 343, 350 (1959) (noting that it would be "grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations").

## VIII.  The Court Should Allow the Government to Use Hypothetical Questions Related to Victims' Reliance on Defendant Ellis's Misrepresentations.

The Government seeks approval to examine certain of its witnesses through hypothetical questions. Courts in this Circuit and others routinely permit the use of hypothetical questions in fraud prosecutions. *United States v. Salzano*, No. 22-CR-690 (EP), 2024 U.S. Dist. LEXIS 35677, at *47 (D.N.J. Feb. 26, 2024) (allowing

government to ask hypothetical questions concerning the materiality of a defendant's actions and characterizing such questions as "plainly relevant and probative" because "[t]he government would be hard pressed to prove this element without asking whether the undisclosed information would have affected the decision maker's analysis" (cleaned up)); *see also United States v. Bush*, 522 F.2d 641, 650 (7th Cir. 1975) (hypothetical questioning normally improper "unless they are used to show that a defendant's active misrepresentations or active concealment were materially relied upon by a victim of the fraud"); *United States v. Isaacs*, 493 F.2d 1124, 1162 (7th Cir. 1974) (holding that "what if" questions were proper in honest-services/corruption prosecution of Illinois governor) (citing, *inter alia*, *United States v. Aleli*, 170 F.2d 18, 20 (3d Cir. 1948)).

To be clear, those cases permitted the use of hypothetical questions for the narrow purpose of proving that the fraudulent representations at issue in those cases were material, *e.g.*, "had you known that this fact was not true, would you have entered into the contract at issue?"  Unlike those cases, the statute charged in this case does not contain a materiality requirement.  In other words, the Government does not need to prove that either the laboratories or insurance companies materially relied on the fraudulent requisition forms defendant Ellis caused to be submitted.  However, the Government intends to introduce evidence that certain laboratories would not have performed the tests that Ark ordered if they had known that defendant Ellis had no interaction with the patients, and that insurance companies would not have reimbursed the laboratories for those tests had

they known the same.  The Government believes that such evidence will be useful to the jury's understanding of defendant Ellis's central role in the fraud scheme charged in the Indictment.  The Government submits that it should be permitted to ask general hypotheticals relating to the laboratory requisition and insurance reimbursement evaluation processes—such as, for example, whether a laboratory requisition form listing as the treating physician a doctor who had no contact with the patient beneficiary would be approved.

The Government is mindful of the Honorable Michael A. Shipp's ruling in *United States v. Santos* on the admissibility of evidence regarding the lending practices of the victim lender in that case.  *See* Crim. No. 18-585 (MAS), 2022 WL 1698171, at *8 (D.N.J. March 22, 2022) (holding "the Court excludes as irrelevant and prejudicial any testimony or hypotheticals about what information former or current Wells Fargo employees would have viewed as material in their capacity as Wells Fargo employees").  However, *Santos* prohibited asking hypothetical questions about the materiality of the defendants' actual responses to questions in loan applications.

Here, the Government's request will not run afoul of *Santos* because materiality is not an essential element of the crime charged in the Indictment and the Government intends to ask general hypothetical questions concerning the laboratory requisition and insurance reimbursement evaluation processes and not questions about the specific facts of this case.

**IX.    The Court Should Find That Statements Made By Defendant Ellis To Members Of Law Enforcement Are Admissible If Used By The Government As Statements Of A Party Opponent, But Are Not Admissible If Offered As Self-Serving Hearsay.**

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(c); *United States v. McGlory*; 968 F.2d 309, 331 (3d Cir. 1992); *United States v. Reynolds*, 715 F.2d 99, 101 (3d Cir. 1983).  A statement determined to be hearsay must be excluded unless the statement falls within an exception to the hearsay rule.  *McGlory*, 968 F.2d at 333.  Under Federal Rule of Evidence 801(d)(2)(A), one exception to the hearsay rule is a statement that is offered against a party and is the party's own statement.  Statements falling under Rule 801(d)(2)(A) are admissible against that party.  *See, e.g. Savarese v. Agriss*, 883 F.2d 1194, 1201 (3d Cir. 1989) ("since the statement is that of the party himself, he can hardly be heard to complain that he cannot cross-examine himself as to his own utterances"); *see also McGlory*, 968 F.2d at 335 n. 17.

Here, defendant Ellis made statements to law enforcement agents as part of the Government's investigation in this case during an interview conducted on January 16, 2018.  The Government seeks to introduce evidence of the following statements made by defendant Ellis during this interview:

- He never reviewed the results of the genetic testing or spoke with any of the patients who received genetic testing where he was the ordering physician.

36

- He acknowledged that governing regulations required the physician who orders diagnostic tests to be the physician who treats the patient for a specific condition.

- He admitted that, although he ordered the tests, he was not actually treating the patients for any medical condition.

- He knew some of the patients who received genetic testing where he was the ordering physician were Medicare beneficiaries.

The Government may offer defendant Ellis's statements in evidence against him as admissions by a party-opponent, under Fed. R. Evid. 801(d)(2)(A).  However, if the statements are not offered by Government, the statements are *not* admissible through cross-examination of the Government's witnesses.  Any attempt by defendant Ellis to elicit them from the Government's witnesses would be an attempt to elicit hearsay.  The statements would be offered by defendant Ellis for their truth, Fed. R. Evid. 801(c), and would impermissibly enable him to introduce his own self-serving statements through the Government's witnesses without subjecting Defendant to cross- examination.  *United States v. Hoffecker*, 530 F.3d 137, 191-93 (3d Cir. 2008); *United States v. Willis*, 759 F.2d 1486, 1501 (11th Cir. 1985); *United States v. Woosky*, 761 F.2d 445, 449 (8th Cir. 1985); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988).

Moreover, Federal Rule of Evidence 106, commonly known as the "Rule of Completeness," provides, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other

part–or any other writing or recorded statement–that in fairness to be considered contemporaneously with it." Fed. R. Evid. 106. "Under this doctrine of completeness, a second writing may be required to be read if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding." *United States v. Soures*, 736 F.2d 87, 91 (3d Cir. 1984) (citing *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982)); *United States v. Davis*, 524 Fed. App'x 835, 841 (3d Cir. 2013). Thus, "[t]he Rule does not require introduction of portions of a statement that are neither explanatory of nor relevant to the passages that have been admitted." *Soures*, 736 F.2d at 91; *United States v. Davis*, Crim. No. 07-090, 2012 U.S. Dist. LEXIS 51086, *15 (Jan. 23, 2012), aff'd 524 F. App'x 835 (3d Cir. 2013);

Two considerations underlie the Rule of Completeness and provide important context for its application: "[t]he first is the misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial." Rule 106 Advisory Committee Note to 1972 Proposed Rules; *United States v. Pendas-Martinez*, 845 F.2d 938, 943 (11th Cir. 1988). For example, in *Soures*, defendant unsuccessfully argued that Rule 106 was violated by the district court, because excerpts from day one of his two days of grand jury testimony were introduced into evidence in lieu of the entirety of his testimony. *Soures*, 736 F.2d at 91. The Third Circuit affirmed the district court's decision–noting that the district court "carefully reviewed the portions that were used, and

required additions where he felt a misleading impression could be created"–that the entirety of the grand jury testimony was not necessary, where excluded portions were neither explanatory nor relevant to the admitted portions.

Here, the statements from defendant Ellis that the Government seeks to introduce into evidence are statements of a party-opponent and do not trigger any of the rule of the completeness concerns set out above.  Moreover, some of the portions of the statements the Government seeks to *exclude* are irrelevant, run the risk of generating unfair prejudice, causing unnecessary confusion, and misleading the jury, and would invite jury nullification.

Accordingly, to the extent that defendant Ellis offers portions of his post-arrest interview that the Government has not offered into evidence, the statements must be excluded as hearsay which does not fall within any exception.  In addition, the Rule of Completeness does not warrant the introduction of such statements from defendant Ellis.

## X.    Defendant Ellis Should Be Ordered to Provide Reciprocal Discovery to the Government As Soon As Possible.

The right of the Government to reciprocal discovery from defendant Ellis is firmly established in Rule 16(b)(1)(A) and (B) of the Federal Rules of Criminal Procedure.  This provision allows the Government, upon compliance with a legitimate request by a defendant for similar material, to:

> inspect and copy or photograph books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody, or control of the defendant and which the defendant intends to introduce as evidence in chief at trial.

Fed. R. Crim. P. 16(b)(1)(A).

Under the clear language of this rule, courts uniformly have allowed reciprocal discovery. *See, e.g., United States v. Bump*, 605 F.2d 548, 551–52 (10th Cir. 1979) (requiring reciprocal disclosure over defendant's objection that it would violate his constitutional rights); *United States v. Sherman*, 426 F. Supp. 85, 93 (S.D.N.Y. 1976).

To date, the Government has produced hundreds of thousands of pages of documents to defendant Ellis in discovery, much of which was produced more than four years ago. Since discovery has been made available to defendant Ellis, the Government is entitled—pretrial—to reciprocal discovery under Rule 16(b). *See, e.g., United States v. Giampa*, 904 F. Supp. 235, 290 (D.N.J. 1995) ("Courts have not hesitated to order pretrial discovery in favor of the Government where the Government has complied with the defendant's discovery requests."). To the extent defendant Ellis has any discovery in his possession, he should be ordered to provide these materials to the Government as soon as possible in advance of trial. This includes any reports of interviews, memorandum, or other documents related to potential Government witnesses, such as Brock Buchholz, or potential defense witnesses.

### XI.  The Court Should Permit the Government to File Additional Motions in Limine as May Be Necessary

As trial preparation progresses, additional evidentiary issues may surface.[7] In that event, the Government respectfully requests leave to file additional in limine motions addressing those issues rather than delay their resolution to trial, which could inconvenience the Court and the jury.

\* \* \*

For the reasons set forth above, the Court should grant the Government's Motions in their entirety.

Respectfully Submitted,

_____
GEORGE L. BRANDLEY
BERNARD J. COONEY
Assistant U.S. Attorneys
United States Attorney's Office
District of New Jersey

---

[7] For example, the Government is filing these motions prior to receiving defendant Ellis's proposed exhibits, prior to receiving defendant Ellis's expert disclosures, and prior to receiving reciprocal discovery.

## **CERTIFICATE OF SERVICE**

I, George L. Brandley, hereby certify that I caused the Government's Motions in Limine and for Reciprocal Discovery to be filed with the Clerk of the United States District Court for the District of New Jersey through the Court's CM/ECF system:

Respectfully Submitted,

_____
GEORGE L. BRANDLEY
BERNARD J. COONEY
Assistant U.S. Attorneys
United States Attorney's Office
District of New Jersey

Date:  December 13, 2024